# IN THE SUPREME COURT OF IOWA

No. 07–2063

Filed November 20, 2009

**JOE COMES, RILEY PAINT, INC.,** an Iowa
Corporation, **SKEFFINGTON'S FORMAL
WEAR OF IOWA, INC.,** an Iowa Corporation, and
**PATRICIA ANNE LARSEN,**

      Appellees,

vs.

**MICROSOFT CORPORATION,**
a Washington Corporation**,**

      Appellant,

and

**PRO-SYS CONSULTANTS, LTD., NEIL GODFREY,
K.L. & K. (London) LTD., MARIAN STARESINIC,**
and **MARC LEFRANCOIS,**

      Intervenors-Appellees.

---

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Defendant appeals from the district court's order modifying a protective order to allow Canadian intervenors access to discovery. **AFFIRMED.**

Brent B. Green and Kirk W. Bainbridge of Duncan, Green, Brown & Langeness P.C., Des Moines, David B. Tulchin, Joseph E. Neuhaus, and Sharon L. Nelles, of Sullivan & Cromwell LLP, New York, New York, and Richard J. Wallis and Steven J. Aeschbacher, Redmond, Washington, for appellant.

Mark L. Tripp of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for intervenors-appellees.

Richard M. Hagstrom of Zelle, Hofmann, Voelbel, Mason & Gette LLP, Minneapolis, Minnesota, for appellees.

**HECHT, Justice.**

Parties to litigation pending against Microsoft in Canadian courts sought to intervene in this case for the purpose of obtaining access to documents and data produced pursuant to a protective order. The district court granted the Canadian plaintiffs' motion to intervene and modified the protective order to allow the Canadians the access they requested subject to the order's terms of confidentiality. Upon our review of the district court's ruling, we affirm.

## I. Background Facts and Proceedings.

Plaintiffs in Iowa (Iowa plaintiffs) filed a class-action, antitrust lawsuit against Microsoft Corporation (Microsoft) in February 2000. At the time, several other similar lawsuits were pending against Microsoft in various federal and state courts. The discovery in the other pending cases was coordinated and protected by a protective order. At the outset of this case, the Iowa plaintiffs and Microsoft agreed to continue to coordinate discovery with the plaintiffs in the other jurisdictions. The protective order entered in the federal multidistrict litigation (MDL) provided confidential information obtained through discovery could be disclosed to "counsel in any action arising out of the same facts and circumstances alleged in [the multidistrict litigation] provided he or she agrees" to be bound by the terms of the protective order. The Iowa Pre-Trial Procedures Order No. 1 provided for discovery in the Iowa case to be coordinated with the discovery in the federal MDL and in other state courts "so as to prevent duplication of effort and waste of private and judicial resources."[1]

---

[1]As a demonstration not only of the sheer breadth of discovery in this case, but of the extent and value of the benefit of the coordination of discovery, the parties estimate that about twenty-three million of the twenty-four million pages of discovery

A stipulated protective order was entered in the Iowa case on January 23, 2003, providing that "certain documents and information produced or to be produced during discovery in this litigation should be kept confidential in order to protect the legitimate business interests of the parties." The protective order limited the universe of persons to whom "confidential" and "highly confidential" documents could be disclosed and limited the use of such documents to the Iowa litigation. It further required the parties either return to the producing party or destroy all "confidential" or "highly confidential" documents within thirty days of the termination of the Iowa litigation. However, the protective order did expressly anticipate its modification by a subsequent court order upon the request of "[a]ny party or third party."

In February 2007, Microsoft and the Iowa plaintiffs agreed to settle the case. The parties stipulated that

> [a]ll discovery materials and information . . . produced or provided by any of the parties or non-parties either before, on or after the date of this Settlement Agreement, whether produced or provided informally or pursuant to discovery requests, shall be governed by all Confidentiality/Protective Orders in force as of the date of this Settlement Agreement, subject to such modifications, if any, that the Court may make to such Confidentiality/Protective Orders as the result of any agreements between Lead Counsel for the Iowa Class and Microsoft or as the result of any future motions or proceedings.

The settlement agreement was approved by the district court on August 31, 2007.

At the time the settlement agreement was reached, several antitrust suits were still pending against Microsoft in Mississippi, Arizona, British Columbia, Quebec, and Ontario. According to Microsoft,

_____

produced in the Iowa action were initially produced in similar lawsuits in other jurisdictions.

plaintiffs in those cases requested discovery from Microsoft after the settlement agreement was reached but before it was approved by the district court in this case.[2]  On September 25, 2007, Microsoft filed a motion requesting modification of the protective order to permit Microsoft to retain the documents from the Iowa action until the suits in Mississippi, Arizona, and Canada were resolved.  The next day, the plaintiffs in the Canadian actions[3] filed a motion in the district court seeking to intervene in the Iowa action to gain access to the Iowa discovery.

The district court granted Microsoft's motion to modify the protective order on October 16, 2007, allowing Microsoft to retain the discovery documents until the litigation in Canada, Arizona, and Mississippi is resolved.  Six days later, the Iowa plaintiffs moved the court to make the modification of the protective order mutual, permitting the Iowa plaintiffs to retain discovery documents in their possession until the termination of the lawsuits in Canada, Mississippi and Arizona.  On December 3, the district court granted both the Canadian intervenors' and the Iowa plaintiffs' motions.  Microsoft appealed.

## II.    Scope of Review.

A trial court has wide discretion to enter a protective order pursuant to Iowa Rule of Civil Procedure 1.504.[4]  *See Farnum v. G.D.*

---

[2]In addition to the discovery request, counsel in the Mississippi litigation sent Microsoft a letter demanding all discovery in the Iowa case be preserved and alleging any willful destruction of the documents would be deemed spoliation.  Iowa plaintiffs allege this demand was later withdrawn.

[3]The "Canadian actions" consist of *Pro-Sys Consultants Ltd. v. Microsoft Corporation,* Supreme Ct. No. L043175, British Columbia, Canada; *K.L. & K. (London) Limited v. Microsoft Corporation,* Sup. Ct. Justice File No. OS-CV-4308, Ontario, Canada; and *Marc Lefrancois v. Microsoft Corporation,* Supreme Ct. No. 06-000087-075, Quebec, Canada.

[4]Iowa Rule of Civil Procedure 1.504 was previously Rule 123.

*Searle & Co.*, 339 N.W.2d 384, 389 (Iowa 1983). We review the district court's decisions regarding discovery for an abuse of discretion. *Id.*; *Mediacom Iowa, L.L.C. v. Inc. City of Spencer*, 682 N.W.2d 62, 66 (Iowa 2004).

### III. Discussion.

Microsoft does not appeal the district court's decision to allow the Canadian plaintiffs to intervene in the Iowa case. Microsoft contends the district court abused its discretion by modifying the protective order to allow the Canadian plaintiffs access to the discovery documents and to allow the Iowa plaintiffs to maintain the discovery documents until the litigation in Mississippi, Arizona, and Canada is resolved.

**A.    Iowa Rule of Civil Procedure 1.504.** Iowa Rule of Civil Procedure 1.504 addresses the availability of protective orders during discovery in civil litigation. Upon a showing of good cause, the district court

> *a.* [m]ay make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> . . . .
>
> (7) [t]hat a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way.

Iowa R. Civ. P. 1.504(1)(*a*). [5]

---

[5]The language of Iowa rule 1.504(1)(*a*) is virtually identical to its federal counterpart. Federal Rule of Civil Procedure 26(c) provides a party from whom discovery is sought may move for a protective order.

> The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
> . . . .

Although the district court has wide discretion to fashion an appropriate protective order, a protective order is not entered lightly. We have previously discussed the good cause showing required to obtain a protective order: "We . . . insist[] on 'a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements in order to establish good cause.' " *State ex rel. Miller v. Nat'l Dietary Research, Inc.*, 454 N.W.2d 820, 823 (Iowa 1990) (quoting *Farnum*, 339 N.W.2d at 389). A district court should consider three criteria when evaluating the factual showing establishing good cause: (1) whether the harm posed by dissemination will be substantial and serious; (2) whether the protective order is precisely and narrowly drawn; and (3) whether any alternative means of protecting the public interest is available that would intrude less directly on expression. *Nat'l Dietary Research*, 454 N.W.2d at 823. " '[T]hese criteria strike a balance between the policy favoring discovery and free expression on one side and a party's interest in avoiding commercial damage and preventing an abuse of discovery on the other.' " *Id.* (quoting *Farnum*, 339 N.W.2d at 390).

In this case, there is no indication that any factual showing of good cause was made to the Iowa district court when the protective order was initially obtained. Instead, the protective order was agreed upon by the parties as a means to expedite and simplify what they correctly anticipated would be an extraordinary discovery process. The order is

---

(G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way[.]

Fed. R. Civ. P. 26(c)(1).

adapted from the one used in the federal MDL action then pending against Microsoft.[6]

Although the district court has wide discretion to enter protective orders, when reviewing district courts' decisions entering or declining to enter protective orders, we have scrutinized the record to determine whether the need for secrecy was justified. In *Farnum*, we affirmed the district court's decision denying the request for a protective order despite the defendants' concern that the discovery would be "traffick[ed] . . . among attorneys for use in other litigation," because the defendant had not made a particularized showing of harm and the protective order was not narrowly drawn. 339 N.W.2d at 388, 391; *see also Mediacom Iowa,* 682 N.W.2d at 68 (holding the district court abused its discretion by entering a protective order because the defendant city had not presented any evidence that the information sought constituted a trade secret); *Nat'l Dietary Research,* 454 N.W.2d at 824 (holding the district court abused its discretion by entering a protective order because defendants had not made a showing that the protected information actually qualified as a trade secret or confidential information or that disclosure would cause them harm).

**B.  Standard for Modifying Protective Orders**. Although our decisions clearly require a showing of "good cause" when a party seeks an order protecting sensitive information, we have not previously been

[6]Unlike the Iowa protective order, the MDL protective order allowed counsel in any actions "arising out of the same facts and circumstances alleged" in the MDL action to obtain access to the "confidential" and "highly confidential" MDL discovery documents if counsel agreed to the terms of the MDL protective order and submitted to the jurisdiction of the MDL court for enforcement of the order. Additionally, before counsel in any collateral action could further disclose the MDL confidential discovery, a no-less-restrictive protective order was required to be entered in the collateral litigation. Accordingly, the Iowa protective order was consistent with the requirements of the MDL protective order.

asked to determine the standard to be applied when an intervenor involved in similar litigation in another jurisdiction seeks to modify a protective order to gain access to discovery in this jurisdiction.

Microsoft urges that our earlier decision in *Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171 (Iowa 1990), answers the question. We are not convinced. In *Tratchel*, at the beginning of litigation, the parties entered into a "Stipulation of Nondisclosure" prohibiting the disclosure of documents identified by the defendant as trade secrets or confidential information. 452 N.W.2d at 181. The district court issued a protective order consistent with the parties' stipulation. Later, at the close of the trial, the plaintiffs requested the protective order be lifted, but the district court ordered compliance with the order. *Id.* The plaintiffs appealed the ruling, contending there was no reason to maintain trade secrets because the defendant no longer manufactured the product at issue and the documents should be available for use by other potential plaintiffs. *Id.* In summary fashion, with no articulated analysis, we noted the district court "carried out the agreement of the parties," and the "[p]laintiffs have not demonstrated extraordinary circumstances, a compelling need to prevent the enforcement of their agreement nor shown that the trial court abused its discretion." *Id.*

We are not persuaded the standard applied in *Tratchel* should apply in this case.[7] We shall examine the issue anew and conduct a full

---

[7]We also note the plaintiffs in *Tratchel* sought to have the protective order lifted entirely and the protected documents and data made available to any other party who might wish to use it for purposes of litigation. 452 N.W.2d at 181. Here, specific, identifiable plaintiffs with nearly identical, currently pending claims against Microsoft seek access to documents and data while agreeing to be bound by the terms of the existing protective order. The Canadian plaintiffs do not claim the documents and data which Microsoft seeks to protect do not qualify as trade secrets nor do they seek the release of the information to the general public. However, despite these factual distinctions between *Tratchel* and this case, we still think it prudent to revisit the issue

analysis of the appropriate standard to apply when the court is requested to modify a protective order under the circumstances presented here.

The standard we referenced without explanation or elaboration in *Tratchel*, and the standard Microsoft urges is controlling in this case, was articulated by the Second Circuit Court of Appeals in *Martindell v. International Telephone & Telegraph Corp.*, 594 F.2d 291, 296 (2d Cir. 1979). In *Martindell*, the federal government intervened in a stockholder derivative lawsuit seeking access to transcripts of pretrial depositions. *Id.* at 292–93. The depositions had been taken pursuant to a court-approved stipulation requiring the depositions be treated as confidential and be used solely for the prosecution or defense of the civil action. *Id.* at 293. The government sought the depositions because it speculated that the testimony might be relevant to its investigation of perjury charges against some of the defendants in the *Martindell* case and hoped to avoid any potential invocation of Fifth Amendment rights by the defendants. *Id.* The federal district court declined to modify the protective order and denied the government access to the depositions. *Id.* The government appealed. *Id.* at 292. The Second Circuit Court of Appeals concluded that

> absent a showing of improvidence in the grant of a Rule 26(c) protective order or some extraordinary circumstance or compelling need, none of which appear here, a witness should be entitled to rely upon the enforceability of a protective order against any third parties, including the Government, and that such an order should not be vacated or modified merely to accommodate the Government's desire to inspect protected testimony for possible use in a criminal investigation, either as evidence or as the subject of a possible perjury charge.

*Id.* at 296.

---

of the appropriate standard to apply when modifying a protective order because of the lack of analysis in the *Tratchel* decision.

Although the language quoted above, and much of the rest of the opinion, suggests the stringent "extraordinary circumstances" test applies only when the government seeks to circumvent the Fifth Amendment rights of suspects in a criminal investigation by accessing confidential depositions taken in a civil case, the Second Circuit has since made clear it will apply the same standard in other contexts as well. *See S.E.C. v. TheStreet.com*, 273 F.3d 222, 229 n.7 (2d Cir. 2001) (affirming that although some courts have incorrectly concluded the *Martindell* rule applies only when the government seeks modification of a protective order, the *Martindell* "extraordinary circumstances" test applies when any third party seeks to modify a protective order).[8]

Other circuits that have considered the issue have applied standards more amenable to modification of protective orders. The Seventh Circuit Court of Appeals was faced with a factual and procedural scenario strikingly similar to this case in *Wilk v. American Medical Ass'n,* 635 F.2d 1295 (7th Cir. 1980). In *Wilk*, five chiropractors filed suit against the American Medical Association (AMA) and others alleging a nationwide conspiracy to eliminate the chiropractic profession. 635 F.2d at 1296. Numerous lawsuits were filed against the AMA in other jurisdictions including the State of New York, alleging essentially the same facts. *Id.* Discovery consisting of over 100,000 documents had been produced in the *Wilk* case, and over one hundred witnesses had been deposed. *Id.* New York intervened in the *Wilk* litigation and

---

[8]We can find no instance in which the Second Circuit Court of Appeals has been faced with circumstances such as are presented here—an intervening plaintiff seeking access to millions of pages of documents and data under the terms of an existing protective order so as to avoid the burdens of time and expense associated with rediscovering and reorganizing the same information in collateral litigation against the same defendant. Even though the "exceptional circumstances" test is a stringent one, it is possible the Second Circuit would conclude intervenors such as the Canadian plaintiffs in this case would meet that strict standard.

requested the court modify the extant protective order to allow the state access to the discovery materials on the same terms as the *Wilk* plaintiffs. *Id.* at 1297. The district court applied an "exceptional circumstances" test, giving great weight to the interests of the *Wilk* defendants in maintaining the protective order and concluding most of the *Wilk* discovery was irrelevant to the New York litigation. *Id.* at 1297–98. The district court denied New York's motion without prejudice, allowing the state to make later motions for access to specific discovery relevant and discoverable in the New York action. *Id.* at 1298.

On appeal, the Seventh Circuit Court of Appeals considered the standard articulated in *Martindell*, but concluded it was not appropriate to require a collateral plaintiff to demonstrate "exceptional circumstances" to gain access to protected discovery. *Id.* at 1299–1300. Balancing the interests at stake, the Court of Appeals noted that

> [p]articularly in litigation of this magnitude, we . . . are impressed with the wastefulness of requiring the State of New York to duplicate discovery already made. . . . We therefore agree with the result reached by every other appellate court which has considered the issue, and hold that where an appropriate modification of a protective order can place private litigants in a position they would otherwise reach only after repetition of another's discovery, such modification can be denied only where it would tangibly prejudice substantial rights of the party opposing modification. Once such prejudice is demonstrated, however, the district court has broad discretion in judging whether that injury outweighs the benefits of any possible modification of the protective order.

*Id.* at 1299 (citations omitted).

The Seventh Circuit Court of Appeals acknowledged the concern that a collateral litigant might exploit another's discovery by filing a frivolous lawsuit only for the purpose of gaining access to the sealed discovery in the first case and emphasized that federal discovery is not to

be used "merely to subvert limitations on discovery in another proceeding." *Id.* at 1300. The court concluded, however, that there was "no suggestion that New York is anything but a *bona fide* litigant who needs access for *bona fide* litigation purposes" and that most of the *Wilk* discovery would be discoverable in the New York action. *Id.* The court was not persuaded by the AMA's argument that allowing New York access to the *Wilk* discovery might encourage litigation by other plaintiffs in hopes of obtaining access to the same discovery material.

> There is no merit whatever to this argument. A *bona fide* litigant is entitled to his day in court. That the expense of litigation deters many from exercising that right is no reason to erect gratuitous roadblocks in the path of a litigant who finds a trail blazed by another. Any legitimate interests in secrecy can be accommodated by amendment of the protective order to include the new litigants within its restrictions, rather than simply vacating it.

*Id.* at 1301.

The court concluded that the district court's decision to deny New York unlimited access to the *Wilk* discovery but allow New York to move for access for specific discovery demonstrably relevant to the New York action was of little value. "If counsel for New York knew exactly what documents were relevant to that suit, he would not have needed to request modification of the *Wilk* protective order at all; he could simply have made a discovery request for those documents before the *New York* court." *Id.*

Other jurisdictions, both federal and state, have rejected the strict *Martindell* standard and favored approaches similar to *Wilk* when determining whether a collateral plaintiff should have access to protected discovery. *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 790 (3d Cir. 1994) (holding that when determining whether to modify protective orders, courts should apply same balancing test used initially to

determine whether to enter a protective order but also consider the party's reliance on the protective order); *Pub. Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 791 (1st Cir. 1988) (rejecting *Martindell* standard in favor of less restrictive standard to modify protective order when party seeking modification can point to some relevant change in circumstances); *Wolhar v. Gen. Motors Corp.*, 712 A.2d 464, 469 (Del. 1997) (adopting *Pansy* standard for modification of protective orders); *Krahling v. Executive Life Ins. Co.*, 959 P.2d 562, 568 (N.M. Ct. App. 1998) (holding party opposing modification of the protective order must show good cause for continuation of a blanket protection order when plaintiff sought modification to share discovery with plaintiffs in other jurisdictions); *Garcia v. Peeples*, 734 S.W.2d 343, 348 (Tex. 1987) (applying a balancing test to conclude blanket protective order was overbroad and plaintiff should be allowed to share discovery with other similarly situated plaintiffs).

After considering the various approaches other courts have taken to address requests to modify protective orders, we conclude the soundest approach is to balance the interests at stake, taking into account the reasons for the issuance of the protective order in the first place and whether the legitimate interests of the parties can still be protected with the suggested modification. The court should also consider to what extent the party opposing modification has reasonably relied on the terms of the protective order and whether the party would have relied on the protective order had the suggested modification initially been included in it. In a case such as this one, the court should consider the value of the interests of the party seeking modification, as well as any public interest in judicial economy and public disclosure, if appropriate. The court should consider whether the party seeking

modification is attempting to circumvent discovery or evidentiary restrictions in some other jurisdiction. Because each situation in which a party or third party seeks modification will be different, we will not try to list all the considerations the district court may take into account when making its decision, but the court should fully and fairly consider all the circumstances supporting the modification, as well as the circumstances mitigating against it, and not employ any presumption for or against modification. To the extent that our decision in *Tratchel* implies there is a presumption against modification, we disavow it.

**C.    Balancing the Interests.**    In this case, the district court's order gave no indication of what factors it considered or what standard it applied when it modified the protective order to allow the Iowa plaintiffs to maintain possession of the discovery until the Canadian litigation was resolved and to allow the Canadian plaintiffs access to the Iowa discovery subject to the same restrictions as imposed on the Iowa plaintiffs and Microsoft. Accordingly, we are unable to discern precisely why the district court concluded modification of the order was justified. However, after balancing the interests at stake, we conclude the district court reached the correct result when it modified the protective order to extend the destroy/return deadline for the Iowa plaintiffs until the litigation in Arizona, Mississippi, and Canada is resolved. This modification maintains the status quo while the other lawsuits are pending.

In determining whether the Canadian plaintiffs should be allowed access to the Iowa discovery on the same terms as the Iowa parties, we are profoundly influenced by the extraordinary waste of time and expense that will result if the Canadian plaintiffs are forced to repeat the work already completed by the Iowa plaintiffs and Microsoft in this case. The parties estimate the documents and data at issue constitute

approximately twenty-four million pages. Microsoft acknowledges that compliance with one particular discovery order, which required the production of seventeen million pages of discovery from other similar litigation, "was a huge undertaking. It was not a case of simply 'pushing a button' to quickly and easily copy and produce old productions." To comply with that single discovery order in this case, Microsoft estimates its staff spent a total of 2700 hours during eighteen weeks locating, compiling, copying, and producing documents and duplicating and converting video items. Microsoft incurred fees of $5.56 million to comply with discovery requests from the Iowa plaintiffs during a four-month period. Microsoft estimates that a "team of attorneys, which at times exceeded 75 persons, worked full-time essentially continuously from November 16, 2005, through September 22, 2006," to comply with discovery obligations in the Iowa lawsuit. These numbers are mind boggling when one considers they represent only part of the work done by Microsoft to address discovery requests in this case. When we add to the mix the time, money, and effort expended by counsel and support staff for the Iowa plaintiffs in organizing and analyzing the information after Microsoft produced it, the staggering cost of repeating the process in the Canadian litigation comes even more sharply into focus.

"The enormous and escalating cost of civil litigation, in this case and many others, runs a great risk of placing redress in the . . . courts beyond the reach of all but the most affluent." *Jochims v. Isuzu Motors, Ltd.*, 148 F.R.D. 624, 632 (S.D. Iowa 1993). This danger can partially be averted by allowing for shared discovery among similarly situated plaintiffs.

> [S]hared discovery makes the system itself more efficient. The current discovery process forces similarly situated parties to go through the same discovery process time and

time again, even though the issues involved are virtually identical. Benefiting from restrictions on discovery, one party facing a number of adversaries can require his opponents to duplicate another's discovery efforts, even though the opponents share similar discovery needs and will litigate similar issues. Discovery costs are no small part of the overall trial expense.

*Garcia*, 734 S.W.2d at 347.

In addition to the overwhelming waste of private and judicial resources that would be avoided if the Canadian plaintiffs were allowed access to the Iowa discovery, we believe the sharing of discovery also advances the important objectives of disclosure and efficiency in the trial system. The goal of modern discovery rules is to "make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682–83, 78 S. Ct. 983, 986–87, 2 L. Ed. 2d 1077, 1082 (1958). However, this goal is often hindered by the adversarial nature of discovery and the gamesmanship of parties locked in litigation. *Garcia*, 734 S.W.2d at 347.

> Shared discovery is an effective means to insure full and fair disclosure. Parties subject to a number of suits concerning the same subject matter are forced to be consistent in their responses by the knowledge that their opponents can compare those responses.

*Id.*

We are mindful as well of Microsoft's assertion that it provided these millions of pages of discovery in reliance on the protective order.[9] The purpose of the protective order is ostensibly to protect valuable business information and trade secrets from disclosure to competitors. However, the suggested modification of the protective order to allow the

---

[9]However, during oral argument, Microsoft was unable to estimate exactly how many pages of the twenty-four million pages of discovery produced would not have been disclosed if not protected by the order.

Canadian plaintiffs access to the Iowa discovery would continue to protect Microsoft's trade secrets and confidential business information from disclosure to competitors or the public. The modification requested by the Canadian plaintiffs does not seek to lift the protective order entirely or release the confidential information to the public. Microsoft's legitimate interest in protecting the value of its confidential information will be maintained as the Canadian plaintiffs will be bound by the protective order just as the Iowa plaintiffs are obligated by its terms.

Our decision is also influenced by the fact that the protective order provides for its modification. As we have already noted, Microsoft has sought and obtained a modification protecting its interests. To the extent that Microsoft disclosed documents and data to the Iowa plaintiffs in reliance on the protective order, it relied upon an order that was expressly made subject to modification upon proper motion. Any belief Microsoft might have entertained that the protective order was inviolate was therefore unreasonable.

Our decision in this case is also strongly influenced by the fact that most of the discovery in this case has already been shared with plaintiffs in several other federal and state lawsuits. There is no allegation that the coordination and sharing of discovery among parties in several different lawsuits in various jurisdictions has resulted in any harm to Microsoft or unauthorized disclosure of confidential information. We are not persuaded that a modification of the protective order allowing the Iowa plaintiffs to share the documents and data in their possession with the Canadian plaintiffs will jeopardize Microsoft's legitimate interests.

Additionally, given that the discovery in this case has been coordinated with discovery in similar lawsuits in other jurisdictions,

Iowa's limited judicial resources were conserved. It would be hypocritical and unreasonable if, after realizing the benefits of a shared discovery process, Iowa courts were to deny the same benefits to courts in British Columbia, Ontario, and Quebec.

Microsoft's main argument, and indeed the only argument against modification that gives us pause, is that the Canadian plaintiffs may not be entitled to any or all of the Iowa discovery. Microsoft points out the Canadian litigation is still in the preliminary stages and has not yet been certified as a class action. Indeed, a ruling entered by a Canadian court concluded the documents and data in the possession of the Iowa plaintiffs are not relevant at the certification stage. *Pro-Sys Consultants Ltd. v. Microsoft Corp.,* 2007 BCSC 1663, [2008] 3 W.W.R. 761, 76 B.C.L.R. (4th) 171, ¶¶25–28. Nonetheless the ruling expressly noted the Canadian court did not discourage the Canadian plaintiffs from pursuing efforts to gain access to the documents and data developed in the Iowa litigation. *Id.* at ¶31–32. We thus do not interpret the Canadian court's ruling as an expression of the proposition that the documents and data in the possession of the Iowa plaintiffs will not be relevant under Canadian law at later stages of the litigation in that country.

Microsoft further suggests that if and when the class action is certified in Canada, discovery rules in British Columbia, Ontario, and Quebec may differ from discovery rules in Iowa. In this context, Microsoft posits the Canadian plaintiffs' effort to gain unlimited access to the documents and data in the possession of the Iowa plaintiffs is calculated to circumvent more restrictive Canadian discovery rules. While we do not presume to interpret, and Microsoft has not cited, the law prevailing in British Columbia, Ontario, and Quebec on the proper scope of discovery in Canadian courts, Microsoft has not presented

evidence tending to prove the Canadian plaintiffs are exploiting liberal discovery rules in Iowa in an effort to evade more restrictive Canadian rules. Further, the Ontario Superior Court has indicated that it is not offensive to Canadian discovery or evidentiary procedures for Canadian litigants to seek access to discovery materials produced in litigation in the United States. *Vitapharm Canada Ltd. v. F. Hoffman-Laroche, Ltd.*, 11 C.P.R. (4th) 230, 6 C.P.C. (5th) 245, [2001] O.J. No. 237, ¶50 (Ont. S.C.J.) (affirmed on appeal, 18 C.P.R. (4th) 267, 20 C.P.C. (5th) 65, [2002] O.J. No. 1400 (Ont. Div. Ct.)). "A Canadian court generally will be reluctant to prevent someone from gathering evidence extraterritorially, as its ultimate admissibility in a Canadian proceeding will be determined by the Canadian courts." *Id.* at ¶45.[10] Denying the motion of Canadian defendants to prevent Canadian plaintiffs from intervening in litigation in the United States to gain access to discovery already produced in the U.S. action, the Ontario Superior Court concluded

> plaintiffs' request for access to discovery evidence [in the United States] which they believe necessary to prepare their case in Canada, a request made through means lawful in the United States, does not violate the rules and procedure of this court. There is no consequential unfairness to the defendants in the Canadian class proceedings.

*Id.* at ¶50.

Thus, we conclude the Canadian plaintiffs are entitled to access to all of the documents and data produced in the Iowa litigation on the same terms as the Iowa plaintiffs. *See Wilk*, 635 F.2d at 1301; *In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 333, 342–43 (E.D. Pa. 2004)

---

[10]In *Vitapharm*, several class actions were pending in both Canada and the United States alleging price fixing against various vitamin manufacturers. *Vitapharm*, at ¶¶6–18. Discovery was already underway in the United States litigation, *id.* at ¶16, but the Canadian class actions had yet to be certified. *Id.* at ¶13. Plaintiffs in the Canadian actions intervened in the federal MDL action in the United States and sought access to discovery covered by a protective order. *Id.* at ¶19.

(concluding plaintiff in similar antitrust class action in Canada was properly granted access to discovery materials subject to a protective order in a federal antitrust action). The determination of which documents are relevant to and admissible in the Canadian litigation is preserved for the Canadian courts.

## IV. Conclusion.

Upon consideration of the arguments of the parties, and after balancing all of the interests at stake, we conclude the protective order was properly modified to allow the Iowa plaintiffs to maintain the discovery in their possession until the litigation against Microsoft in Arizona, Mississippi, and Canada is terminated. The Canadian plaintiffs shall be allowed access to the documents and data in the possession of the Iowa plaintiffs under the terms of the protective order. Microsoft's important interest in confidentiality of the documents and data is preserved because the Canadian plaintiffs are bound by the terms of the protective order. The relevance of the documents and their admissibility in the Canadian litigation are matters properly reserved for the Canadian courts.

**AFFIRMED.**

All justices concur except Appel, J., who takes no part.